UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                              Plaintiff,

    v.

JEFFREY PUZZULLO,

                              Defendant.

Case No. 25-cr-188 (ALC)

**SENTENCING MEMORANDUM ON BEHALF OF**
**DEFENDANT JEFFREY PUZZULLO**

GOTTLIEB TOWNSEND

111 Broadway, Suite 701
New York, NY 10006
Tel.: (212) 566-7766
Fax: (212) 374-1506

*Attorneys for Defendant*
*Jeffrey Puzzullo*

## I.    INTRODUCTION

This memorandum is submitted on behalf of defendant Jeffrey Puzzullo in anticipation of his January 22, 2026 sentencing.  On April 24, 2025, Mr. Puzzullo pleaded guilty pursuant to an Information to four counts: Conspiracy to Commit Securities and Wire Fraud, in violation of 18 U.S.C. § 371, Securities Fraud, in violation of 15 U.S.C. § 78j(b), 17 CFR § 240.10b-5, and 18 U.S.C. § 2, Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 2, and Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A.

The phrase "nice guys finish last" has never rung truer than in the instant matter.  For over twenty years, Mr. Puzzullo sacrificed his business, time, and money because he truly believed in the honesty and integrity of the leaders of the conspiracy in which he became involved and the legitimacy of their proposed Legacy Sports project.  Regrettably, Mr. Puzzullo instead found himself in the middle of a criminal conspiracy notwithstanding his good character, intentions, and lack of any criminal history.  From the outset of this case, the question hovering over every aspect of the defense was, why, why did someone with a spotless record of exemplary business practices and no trace of any criminal activity become involved in a criminal conspiracy?

The answer ultimately was found when he was evaluated by a forensic expert in autism diagnosis and treatment, Dr. Laurie Sperry.  For the first time in his life at the age of 69, Mr. Puzzullo was diagnosed with autism that manifested itself by his being susceptible to manipulation by others because of his generous heart and trusting nature of others.  Even Mr. Puzzullo's wife did not know or understand why Mr. Puzzullo frequently allowed himself to be taken advantage of by others, even strangers, time and time again until she recently learned of Dr. Sperry's evaluation.

Mr. Puzzullo stands before the Court as a result of the unscrupulous actions of Randy and Chad Miller, the ringleaders of the criminal conspiracy who realized that they could manipulate and use Mr. Puzzullo to do whatever they wanted, even if it meant deceiving investors.  To be clear, we do not in any way excuse Mr. Puzzullo's criminal conduct but, rather, seek to explain how this law abiding, good, hardworking, and generous man crossed the line into criminal behavior.  From the moment his home was searched by law enforcement, Mr. Puzzullo did not hesitate to swiftly and fully cooperate with the Government, accept responsibility, and do everything in his power to right the wrong of his actions in connection with the Legacy Sports project.

As Probation makes abundantly clear in the Presentence Investigation Report ("PSR"), this is a unique case where every criminal act committed by Mr. Puzzullo was at the direction and order of his co-conspirators.  Because of this, and Dr. Sperry's evaluation, we agree with Probation's analysis and respectfully request that Mr. Puzzullo be sentenced to time served on all counts for all the reasons outlined below.  *See* Addendum to the Presentence Report, at 40.

## II.    THE PRESENTENCE INVESTIGATION REPORT AND GUIDELINES CALCULATION

### A.  Downward Departure Variance for Minimal Role

The defense's sole objection to the PSR concerns a downward variance for minimal role with respect to the guidelines calculation.  Probation calculates Mr. Puzzullo's guidelines offense level to be 37.  The level is then adjusted down five points due to his quick acceptance of responsibility and offender status, resulting in a final offense level of 32, which carries a corresponding guidelines range of 121 – 151 months.  The chart below demonstrates how Probation and the defense calculate Mr. Puzzullo's sentencing guidelines.

2

| CATEGORY | PROBATION | DEFENSE |
|---|---|---|
| **Base Offense Level** – 18 U.S.C. § 1343<br>USSG §2B1.1(a)(1): Wire Fraud | 7 | 7 |
| **Specific Offense Characteristics**<br>USSG §2B1.1(b)(1)(O): Loss Calculation | **+28** | **+28** |
| **Specific Offense Characteristics**<br>USSG §2B1.1(b)(2)(A)(i): At Least 18 Victims | +2 | +2 |
| **Victim Related Adjustment: None.** | 0 | 0 |
| **Adjustment for Role in the Offense: None.** | 0 | 0 |
| **Adjustment for Obstruction of Justice: None.** | 0 | 0 |
| **Preliminary Offense Level** | **37** | **37** |
| **Acceptance of Responsibility**<br>USSG §3E1.1(a): General | -2 | -2 |
| **Acceptance of Responsibility**<br>USSG § 3E1.1(b): Timely | -1 | -1 |
| **Chapter Four Adjustment**<br>USSG §§4C1.1(a)(1)-(10): Zero-Point Offender | -2 | -2 |
| **Adjusted Offense Level** | **32** | **32** |
| **Mitigating Role**<br>USSG §3B1.2: Minor Participant | **0** | **-4** |
| **Final Offense Level** | **32** | **28** |
| **Appropriate Guidelines Range** | **121-151 Months** | **78-97 Months** |

The only difference between the PSR and defense calculation of the appropriate offense level is the four points pertaining to Mitigating Role. Based on the facts and arguments that follow, the defense seeks a four-point reduction for Mitigating Role that would result in a Guidelines Range of 78-97 months. As a preliminary matter, the PSR guidelines calculation significantly overstates Mr. Puzzullo's role and culpability in the conspiracy. In fact, Probation acknowledges that Mr. Puzzullo's culpability relative to the other defendants is a mitigating factor. *See* Addendum to the Presentence Report, at 39. Moreover, his compensation for his work involved in the scheme was significantly smaller compared to the loss amount and much less than what the Millers received. *Id.* In contrast, both Millers were sentenced to lower terms notwithstanding their profit from the scheme dwarfs that of Mr. Puzzullo. Randy Miller, leader of the conspiracy was sentenced by the Honorable Judge Lewis A. Kaplan on September 11, 2025 and received a 72-

month term of imprisonment, while Chad Miller was sentenced to 60 months imprisonment by the same judge. Given Mr. Puzzullo's significantly lesser role in the conspiracy together with his swift and unconditional cooperation and acknowledgment of his role and culpability, a 121 – 151 months guidelines range is not an accurate or fair representation of Mr. Puzzullo's involvement.

Mr. Puzzullo's downward variance application (discussed further in this brief) is directly supported by the factors set forth in by the Sentencing Guidelines when determining the minimal role reduction: (i) the degree to which the defendant understood the scope and structure of the conspiracy; (ii) the degree the defendant participated in planning or organizing; (iii) the degree the defendant exercised decision making authority or influenced decisions; (iv) the nature and extent of the defendants participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had; and (v) the degree the defendant stood to benefit from the criminal activity. USSG § 3B1.2, Commentary, Application Note 3(C). Furthermore, the Commentary provides that "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline." *Id.*

These factors all overwhelmingly apply to Mr. Puzzullo's role and conduct in this conspiracy. Accordingly, Mr. Puzzullo submits that when all the circumstances of his limited involvement in this case are considered, which will be discussed in more detail below, a downward variance is appropriate.

### III.    SECTION 3553(A) FACTORS AS APPLIED TO MR. PUZZULLO

Since the Supreme Court decision in *United States v. Booker*, district courts have not been bound to sentence within the determined guidelines range. 543 U.S. 220 (2005). Instead, the guidelines have become a factor which judges are instructed to take into account when determining

an appropriate sentence. Courts are permitted to tailor the sentence in consideration of other statutory concerns. *Id*, at 245. With that in mind, the factors to be considered pursuant to §3553(A) include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentence range established for –
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[;]
>
> (5) any pertinent policy statement;
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. §3553(A)(1)-(7); *see also*, *Booker*, 543 U.S. 220.

In *Gall v. United States*, the Supreme Court emphasized the importance of an "individualized assessment based on the facts presented." 552 U.S. 38, 39 (2007). Essentially, *Gall* instructs the sentencing court that a Guidelines calculation is the **initial benchmark** for determining a sentence, but it is not the only consideration. *Id*. Indeed, the Second Circuit has confirmed that district courts "must form [their] own view of the nature and circumstances of the offense and the history and characteristics of the defendant," and it is "**emphatically clear**" that

the guidelines are "**truly advisory**." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (internal quotation marks omitted) (emphasis supplied).  Relatedly, the Supreme Court has made evident that a district court judge may depart – upwards or downwards – from the guidelines, as long as serious consideration is given, and an explanation is provided as to the unusually lenient or harsh sentence; extraordinary circumstances are no longer required.  *Gall*, 552 U.S. at 46.

### A.  BACKGROUND AND NATURE OF THE OFFENSE

#### 1.  Mr. Puzzullo's Introduction to Randy Miller and Legacy Sports

Because this Court has not been involved in this matter until sentencing, we believe a more detailed background of the facts leading up to Mr. Puzzullo's guilty plea than typically included in a sentencing memorandum will be useful.

In the fall of 2001, Mr. Puzzullo owned a California-based construction company that expanded its business operations into the Phoenix, Arizona area to explore new opportunities in the municipal utility and commercial building markets.  One of Mr. Puzzullo's Phoenix employees approached him and advised him that he knew someone from his church who needed help figuring out how to build a complex of various sports fields and event spaces eventually called "Legacy Sports Park" ("Legacy" or "Legacy Park") and thought that Mr. Puzzullo would be a good resource.  Shortly thereafter, this employee introduced him to Randy Miller, a former professional baseball player in the 1980's.

From the very beginning, Randy Miller ("R. Miller") zeroed in on Mr. Puzzullo's kind and generous nature, saw a perfect mark, and made every effort to use and manipulate him to carry out his criminal conspiracy for his personal benefit.  Early on in their relationship, R. Miller offered Mr. Puzzullo the general contractor position to build the Legacy Sports Park with the caveat that the project needed working capital to pay "old debts" and remain operational.  R. Miller convinced

Mr. Puzzullo to pay off all of Legacy's outstanding debts in the form of a loan to Legacy Sports in exchange for the general construction contract. For reasons that are inexplicable, instead of getting paid by R Miller and Legacy for his work as the general contractor, Mr. Puzzullo instead loaned Legacy $125,000 for the job. Since Mr. Puzzullo did not have access to that much money on his own, to pay Legacy's debt as R. Miller demanded, Mr. Puzzullo reached out to family members who chipped in their own money that was then disbursed to Legacy's creditors.

During this process, R. Miller told Mr. Puzzullo that an additional $127,875.15 was needed to pay off newly incurred debts. And, again, Mr. Puzzullo inexplicably assented to providing the funds. To raise this additional money, Mr. Puzzullo applied for and received a personal home equity loan. To date, neither R. Miller nor Legacy has **ever** made any attempt to pay off the loans that Mr. Puzzullo and his family funded. **What is most disturbing is that at the time Mr. Puzzullo loaned R. Miller hundreds of thousands of dollars and assumed significant debt, his personal businesses were already struggling.** What happened next is nothing short of heartbreaking. As a result of Mr. Puzzullo's mounting business and personal debts, **the bank holding the second mortgage on his home commenced foreclosure proceedings** that resulted in Mr. Puzzullo losing his home. Even though R. Miller knew that Mr. Puzzullo had pledged his life savings to help fund the Legacy project, he did nothing to honor his promises that the loans would be repaid. He quickly realized that Mr. Puzzullo was vulnerable, easily manipulated to do whatever he wanted done even if it resulted in Mr. Puzzullo's financial ruin. From the very outset of their relationship, R. Miller recognized that he could take advantage of Mr. Puzzullo by dangling the Legacy project over his head and his threat that if Mr. Puzzullo failed to do as directed, he would never receive additional money for his work or pay off the outstanding loans. This would characterize the nature of their relationship for decades.

During the early stages of Legacy in the early 2000's, Mr. Puzzullo had an office in the Phoenix area, and R. Miller immediately moved into the office, claiming that it would be easier to work together if they were physically in the same office.   R. Miller co-opted a desk, used Mr. Puzzullo's supplies and never once offered to compensate Mr. Puzzullo for anything.  R. Miller also directed Mr. Puzzullo to bear the expense of hiring two women despite learning that neither of them were qualified for the roles for which they were employed.

Once the recession struck in 2008, Mr. Puzzullo had to close his Arizona office to decrease operating costs for his business.  During the move, **R. Miller stole various office supplies, filing cabinets and even the Ford F-150 pickup truck that belonged to Mr. Puzzullo's company.**  R. Miller, as usual, has never paid nor offered to pay for these items.

As the Legacy project progressed, Mr. Puzzullo's presence in Arizona became increasingly more important.  R. Miller insisted that Mr. Puzzullo stay at his mother's house, a friend's rental house, or at his girlfriend's home rather than pay for a hotel.   Even though R. Miller stole Mr. Puzzullo's company vehicle, he did not provide him with transportation during these visits which resulted in Mr. Puzzullo being confined to whatever home in which he was staying.

Once Legacy transformed from a mere idea into a plan to build the sports complex, R. Miller ordered Mr. Puzzullo to be stationed in Arizona even more frequently.  Initially, Mr. Puzzullo paid for his own flights, but that became too expensive, and so he opted to drive from his home in San Diego to Arizona two to three times per month without reimbursement for expenses. Each trip was about 1,000 miles round trip.  At no point did R. Miller offer to cover Mr. Puzzullo's flights or the cost of gas, despite his demand that Mr. Puzzullo be present in Arizona.  Soon, Mr. Puzzullo's traveling back and forth from San Diego increased significantly to the point that Mr. Puzzullo traveled to Arizona every week for Legacy.  When Mr. Puzzullo attempted to raise

concerns about the costs of travel and lodging, R. Miller summarily dismissed him and refused to address the mounting financial burden on him. Instead, Mr. Puzzullo was told that Legacy would not pay for travel or lodging and that Mr. Puzzullo was required still to show up for work every day. **Incredibly, at that point not only was Mr. Puzzullo paying for all expenses out of his own pocket, but he was not being paid at all for his professional services as the general contractor**. Months went by until Chad Miller ("C. Miller"), R. Miller's son, relented and authorized Mr. Puzzullo to submit his hotel expenses. **To date, neither the Millers nor Legacy Sports have ever reimbursed Mr. Puzzullo for any of the costs he incurred out of pocket for his travels.**

Mr. Puzzullo certainly wanted the Legacy project to succeed—he had sacrificed his life savings to accomplish that goal. After investing not only his own savings but also his family's money, Mr. Puzzullo felt he had no alternative other than to carry the project to completion if he had any hope of being paid for his services. Mr. Puzzullo now realizes that he was taken advantage of and is painfully aware that his actions have harmed the innocent victims of the Millers' criminal scheme. He is truly sorry for what he has done, wishes that he had seen R. Miller for who he was at the beginning, and had the fortitude and insight to take steps to prevent what ultimately transpired. Mr. Puzzullo never intended to bring harm to anyone and lives with the pain knowing his actions harmed innocent people. *See* Undated Letter from Jeffrey Puzzullo, attached as **Exhibit A**, at 1.

## 2. The Offense Conduct

When viewed against this backdrop of abuse and manipulation inflicted by Randy and Chad Miller from the outset of their professional relationship, it becomes readily apparent that Mr. Puzzullo's role in the Legacy Sports project – and in the broader criminal conspiracy orchestrated

by the Millers – was minimal.  As will be discussed, Mr. Puzzullo's involvement was the direct result of his autism that at the time of his work with the Millers was unknown to him or his loved ones *infra,* **II.B.**   As confirmed throughout the PSR, Mr. Puzzullo made no independent decisions—every criminal act by Mr. Puzzullo was at the direction and order of Randy or Chad Miller or both.  We address a handful of those instances below.

R. Miller began soliciting interest in building a multi-purpose youth sports park in the Phoenix, Arizona area in the early 2000s.  PSR, at ¶ 13.  It was at this early stage that Mr. Puzzullo became involved in the construction aspects of the project.  Over the years, there were numerous iterations of the project at various sites in Arizona.  *Id.*  During this time, R. Miller worked with different financial backers and construction companies to try and generate sufficient investment to build the sports park.  *Id.*  By the mid-2010's, C. Miller, who just completed a five-year career as a professional minor league baseball player, started working for his father on the Legacy project. *Id.*

In February 2016, R. and C. Miller hired Sports Facilities Advisors ("SFA") to perform a third-party feasibility study on their plan to build Legacy Sports Park.  PSR, at ¶ 14.  The purpose of the study was to have an independent confirmation supporting the revenue projections for the business plan to be shared with potential investors.  *Id.*  Mr. Puzzullo was not involved in the hiring of SFA nor was he ever consulted concerning their retention.  Mr. Puzzullo's exclusion from such matters was routine even though he was involved in Legacy in its infancy.

SFA members met with Randy and Chad Miller, never with Mr. Puzzullo.  PSR, at ¶ 15.  During the meeting, SFA was given financial documents and Letters of Intent ("LOIs") by the Millers to review for their evaluation.  *Id.*  Ultimately, SFA found that many of the statements made by Legacy Park related to its business plan were overly optimistic.  *Id.*  R. Miller pushed

10

back repeatedly on SFA's findings because he knew that the low projections hurt any chance of attracting investors. *Id*. Based on SFA's analysis, SFA concluded in a draft *pro forma* that the sports park would generate only $29.7 million in its first year. PSR, at ¶ 16. In response, Legacy submitted written objections to SFA and procured new LOIs which were turned over to SFA. *Id*.

SFA completed its feasibility study in August 2016 and revised its year one projections from $29.7 million to $37.9 million. PSR, at ¶ 17. SFA further concluded that the proposed sports complex project would only be viable on very tight margins. *Id*. By January 2018, at the direction of Randy and Chad Miller, Mr. Puzzullo prepared a business plan for Legacy Park to share with investors. PSR, at ¶ 18. The Millers instructed Mr. Puzzullo to create a business plan that materially altered the SFA *pro forma* to present the information in a misleading way to potential investors. *Id*. More specifically, the Millers directed Mr. Puzzullo to omit the cover memo outlining the caveats and warnings concerning the tight margins expressed by SFA and instead, prepare a cover letter with false statements. *Id*. The Millers also directed Mr. Puzzullo to change the date of the *pro forma* from August 2016 to September 2017 to make it appear more recent. *Id*.

Over the next several years, R. and C. Miller unsuccessfully sought financing for the construction of Legacy Park. PSR, at ¶ 20. In 2019, Zeigler, a specialty investment bank, finally agreed to assist the Legacy Park project in their attempts to acquire financing with municipal bonds. *Id*. To facilitate the Millers' solicitation for investments in the Legacy Park bonds, they directed Mr. Puzzullo, as well as others, to prepare a preliminary limited offering memorandum ("2020 Offering Memorandum"), which purported to disclose all material facts, circumstances, and risks related to the project and the bonds. PSR at ¶ 22. The Millers included in the 2020 Offering Memorandum, two independent feasibility studies that purported to validate the financial

viability of Legacy's business plan, the altered *pro forma*, and a peer review study of the altered *pro forma*. PSR at ¶ 24.

After publishing the 2020 Offering Memorandum, the Millers implemented steps to promote the sale of the Legacy Park bonds to prospective investors relying on false information. PSR, at ¶ 27. Specifically, the Millers offered a webinar presentation where they presented a slide deck that touted the commitments of over 50 organizations that they represented to investors had recently signed letters of intent and pre-contracts to ensure that Legacy Park would be close to 100% occupancy on day one. *Id*. These letters of intent falsely represented that the organization had signed them recently. C. Miller also falsely claimed to investors that various sports leagues made commitments that supported Legacy's projected revenue. *Id*. Mr. Puzzullo was not present or involved in this webinar presentation. The potential investors were not informed that the letters of intent, and pre-contracts as well as a financial *pro forma* spreadsheet had been altered by Mr. Puzzullo at the specific direction of the Millers who provided him with the false information and data that he relied on in creating documents that misrepresented the truth about Legacy's weakened financial support. PSR, at ¶ 29.

In August 2020 the Legacy Park bond offering closed after raising approximately $251 million dollars. PSR, at ¶ 36. Then, in March 2021, Randy and Chad Miller caused the issuance of a supplemental bond offering and it raised an additional approximately $33 million. *Id*.

### 3. Two Decades of Free Labor from Mr. Puzzullo

As previously stated, the beginning of Mr. Puzzullo's relationship with Legacy began with him paying off R. Miller's debts. In June 2014, Mr. Puzzullo executed a contract with Legacy Sports, LLC to provide construction management services to Legacy for the sum of $3 million dollars. *See,* June 1, 2014 Contract between Puzzullo, Inc. and Legacy Sports, LLC, attached as

**Exhibit B,** at 31.  However, Legacy never fulfilled any of its obligations under this contract, even though Mr. Puzzullo already spent countless hours of uncompensated preconstruction work associated with the design of the project.

On February 8, 2020, Mr. Puzzullo executed a second contract with Legacy Sports USA, LLC for $2.25 million dollars.  *See,* February 8, 2020 Contract between Puzzullo, Inc. and Legacy Sports USA, LLC, attached as **Exhibit C**, at 10.  **For Mr. Puzzullo's services provided in connection with this contract, he was paid a total of $576,581.20 from October 6, 2020 until May 4, 2022.**  That was the **entirety** of Mr. Puzzullo's compensation from Legacy Sports during the entire twenty-one years of his association with Legacy and Millers**.**  PSR, at ¶74.

There was one additional executed contract between Mr. Puzzullo and Legacy Cares, Inc. on May 27, 2020 for $750,000 to provide construction project consulting and project management services.  *See* May 27, 2020 Contract between Puzzullo, Inc. and Legacy Cares, Inc., attached as **Exhibit D**, at 11.  Mr. Puzzullo was never notified that this contract was terminated in accordance with its terms.  Instead, he was informed at some point in 2020 that the contract was being reassigned to a sub-contractor who would replace him for construction monitoring services and that going forward, Mr. Puzzullo's services pursuant to that agreement were no longer required.

In December 2020, two months after Mr. Puzzullo received the only payment from Legacy Sports in 20 years, Douglas Moss of Legacy Cares, on behalf of Legacy Sports, sent a letter to Mr. Puzzullo informing him, without explanation, of Legacy's decision to reduce Mr. Puzzullo's monthly payment from $50,000 to $25,000 effective immediately.  *See* December 30, 2020 Letter from Douglas Moss to Jeffrey Puzzullo, attached as **Exhibit E**.  It wasn't until on or about June 1, 2022 that Mr. Puzzullo received a phone call from R. Miller informing him that his services were no longer required on the project and the June 2022 invoice would not be approved for payment.

Based on the foregoing, the total compensation Mr. Puzzullo received from his 21-year association with the Millers and Legacy for over two decades of unpaid services, out-of-pocket travel expenses, and substantial time devoted was $323,706.05 after deduction of the unpaid $252,875.15 "loan" Mr. Puzzullo was tricked into providing to Legacy, which does not even include the 10% annual interest accrued that was also never paid. PSR at ¶ 74. Breaking down that number even further, Mr. Puzzullo received about **$15,414 per year over the 21 years** he worked with Legacy. While the Millers were pocketing and spending millions of dollars illegally for their own personal use, Mr. Puzzullo did not get paid for the construction management and other services he performed while losing his home and life savings in the process.

Mr. Puzzullo complied with every demand and order he received from the Millers despite facing financial ruin as a result of the Millers' manipulating and using him. Mr. Puzzullo's only concern was to accomplish the task at hand, a hallmark of Autistic Spectrum Disorder—and try to recoup all he had lost to the Millers in the process. He failed to comprehend the depth of the Milllers' intent to commit fraud. As a result, Mr. Puzzullo was drawn into a fraudulent and criminal scheme not of his creation or design and certainly not for any financial windfall. On the contrary, Mr. Puzzullo had substantial money of his own and that of his family tied up with Millers. The Millers, on the other hand, saw a vulnerable, affable, and easily manipulated older man who sought to please those around him and whom the Millers used to achieve ill-gotten financial success at the expense of their victims.

### B. MR. PUZZULLO'S AUTISM DIAGNOSIS

When Mr. Puzzullo contacted our office before his arrest when he received a Grand Jury subpoena, it quickly became clear that there was something unknown about Mr. Puzzullo's personality and character that allowed him to be used and manipulated by the Millers to further

their criminal conspiracy.  As his attorneys, we concluded that a complete psychological evaluation was necessary after speaking with Mr. Puzzullo about his involvement with the Millers and after witnessing firsthand Mr. Puzzullo's social limitations when discussing why he did everything the Millers ordered him to do.  We raised our concerns with Mr. Puzzullo's wife and explained why a psychological workup was warranted.  She then for the first time shared with us her own apprehensions regarding Mr. Puzzullo's behavior over the years they were married.

Dr. Laurie Sperry, Ph.D. was retained to undertake the forensic evaluation.  On March 10, 2025, Mr. Puzzullo met with Dr. Sperry, Ph.D., who has been "recognized as an autism expert by multiple courts."  *See* March 12, 2025 Dr. Laurie Sperry Expert Report of Mr. Puzzullo, attached as **Exhibit F**, at 2.  In her evaluation, Dr. Sperry administered the following assessments: Person Centered Plan, Autism Spectrum Quotient, Autism Diagnostic Observation Schedule-2 Module 4 ("ADOS"), Behavior Rating Inventory of Executive Functioning—Adult (BRIEF-2A), and interview with Mr. Puzzullo.  *Id*.

Under the ADOS-2 Module 4 Algorithm for DSM-5, the cut-off for an Autism Spectrum Disorder ("ASD") diagnosis is 8.  ADOS-2 is considered a gold standard assessment tool in the diagnosis of ASD.  *Id*, at 20.  Each module consists of a set of standardized scenarios including structured conversations and social settings that Dr. Sperry presented to Mr. Puzzullo.  *Id*.  **Mr. Puzzullo's score of 15 is nearly double the ASD cut-off score of 8**.  *Id*, at 23.  Therefore, according to the ADOS-2 Classification, Mr. Puzzullo easily meets the criteria for a diagnosis of ASD Level 1 Requiring support without Accompanying Intellectual Impairment.  *Id*.  Stated differently, a person with Level 1 autism is usually highly articulate, in speech and in writing, attentive to detail, straightforward and offbeat in their mannerisms.  *Id*.  Most people with ASD, including Mr. Puzzullo, understand language in a very concrete and literal manner, meaning they

15

take the words they hear at face value rather than understanding the meaning of the words or how they are intended to be understood based on the speaker's facial expression, tone, body language, and context. *Id*, at 24.

Mr. Puzzullo's autism had a direct impact on his relationship with the Millers and Legacy Sports. Dr. Sperry inquired about Mr. Puzzullo's experience working on the Legacy Project. *Id*, at 25. He told her that he worked as a developer of the project since 2001 and did everything on a volunteer basis, including out of pocket travel expenses and contributing approximately $250,000, money he obtained after mortgaging his home and soliciting loans from his mother and two sisters. *Id*. When Dr. Sperry pressed Mr. Puzzullo as to why travel was not included in his contract, Mr. Puzzullo responded that "they didn't want to execute a contract." *Id*.

Dr. Sperry explained that it never occurred to Mr. Puzzullo that the refusal to execute a contract was suspect or to cut his losses and walk away from the project **because his cognitive inflexibility and difficulty reading others prevented him from seeing or appreciating the malintent of the Millers and the clear risks inherent in this venture**. *Id*. Essentially, people with autism have difficulty drawing conclusions based on the rules of logic. *Id*. Most reasonable people would have recognized that undertaking a construction project of this scale without a contract was inadvisable and that, after the Millers and Legacy failed to repay the loans to Mr. Puzzullo or compensate him for the time already devoted to the project, the wise course of action would be to disengage and walk away. *Id*. However, Mr. Puzzullo is "outcome focused," a hallmark of his autism diagnosis, which is coupled with his constant desire to please others; accordingly, he failed to see the larger picture about what was transpiring and did not question the veracity of what the Millers were telling him or the repercussions of allowing them to manipulate him. *Id*.

Ultimately, Dr. Sperry's evaluation revealed that "**Mr. Puzzullo's socialization skills are the equivalent of a young child."** *Id,* at 11. She further explained that Mr. Puzzullo is "**extremely naïve, struggles to read social intent of others and thus is easily duped into risk or harmful decision making.**" *Id.* (emphasis added).

Kari Puzzullo, Mr. Puzzullo's wife of 27 years, was also interviewed by Dr. Sperry, and described Mr. Puzzullo as an impulsive individual who makes decisions without thinking how they might cause him trouble financially. *Id*, at 15. She further confirmed that Mr. Puzzullo is driven to complete projects which involve his circumscribed interest in construction and struggles during his free time. *Id.* As explained by Dr. Sperry, Mr. Puzzullo's role and awareness of what was going on during his time at Legacy Park should be considered in light of his impulsivity, tendency to get stuck on solving a problem rather than seeing the larger picture, and difficulty monitoring his own behavior. *Id.*

It is also compelling that the Legacy Sports project was not the first time that Mr. Puzzullo has been taken advantage of. *Id*, at 26. Mr. Puzzullo told Dr. Sperry about a number of failed projects that he was involved in where he was similarly not paid. *Id*, at 25. One example was the "Nigerian Queen" for whom he worked for approximately three years. *Id*, at 26. Mr. Puzzullo flew to Nigeria to help with a project and was never compensated. *Id.* He also worked with a company called Forum Group Ltd., owned by Jerry Wang. *Id.* In this instance, Mr. Wang wanted help getting a project off the ground in Nevada and Mr. Puzzullo dedicated about three years of his time, again without pay. *Id.* Eventually, Mr. Puzzullo was paid approximately $5,000 with the understanding that it was a loan. *Id.* "**In summary, the old adage fool me once shame on you, fool me twice shame on me doesn't apply here. Mr. Puzzullo has been duped again and**

**again and continues to focus on the details and the projects rather than the larger picture**."
*Id*, at 26.

### C.  MR. PUZZULLO'S BACKGROUND, CHARACTER, AND REPUTATION

The facts and circumstances here serve as powerful mitigation and strongly support a non-incarceration sentence. Mr. Puzzullo lived nearly 70 years of his life without any contact with law enforcement.  His nature and character are exemplified through the myriad letters written on his behalf.  Further, his limited role in the wrongdoing, and his efforts to promptly make amends by accepting responsibility and cooperating all militate toward mitigation.

#### 1.  Personal Background

Mr. Puzzullo was born on May 17, 1955 in Syracuse, New York.  He grew up in a large Italian family that emphasized hard work, timeliness, helping where you can, responsibility, and following through with your commitments. *See* **Ex. F**, at 6.  Mr. Puzzullo's father died at age 77 in 1994 and worked in the electronics department of a factory.  His mother died at age 82 in 2005 and worked in retail at a department store. Mr. Puzzullo has three siblings: his brother, David John Puzzullo, passed away from cancer at 47, his older sister Judith Gersbacher, 78, resides in Syracuse, New York and is a retired banker, and his younger sister, Anne Marie Bond, 63, also resides in Syracuse, New York and owns a vehicle repossession company.

The children were raised by their parents in a very supportive, warm, and loving household. Specifically, they were a very demonstrative family and would hug and kiss people right from the outset. *Id*.  Mr. Puzzullo's parents instilled many valuable ideals that he still follows in his life to this day. *See* **Ex A**, at 1.  They were extremely hard-working people who did their best to make sure that their children had the basics for a good life and emphasized education, religion, and health, and encouraged exploration and curiosity. *Id*.  Even though the family did go through some

18

difficulties financially, Mr. Puzzullo's mother was able to feed their family of six with mere pennies to ensure that the family would sit around the kitchen table every night for dinner. *Id*. Mr. Puzzullo learned to cook from his mother and picked up a love for grilling on the barbeque from his father, which is something that he still enjoys to this day. *Id*.

Growing up, Mr. Puzzullo preferred to play with a hammer and nails and wanted to assist his father with construction projects around the house rather than play with toys. *See* **Ex. F**, at 6. Mr. Puzzullo's interest in construction persisted as he progressed through high school. One week after graduating from high school in Syracuse, New York, he began working at Martisco Corporation of Syracuse, a supplier of municipal and industrial pipe valve and fitting products. He started as a yard worker and continued to work his way up to becoming the company's operations manager after seven years.

Following this experience, in October 1980, Mr. Puzzullo sought a more advanced position in the same industry. He then reached out to many similar businesses around the country and ultimately was offered employment opportunities in several different states. Eventually, Mr. Puzzullo relocated to San Diego where he became the branch manager of TFI Waterworks, a San Diego based utility industry water and sewer system materials supply company. Within two years of employment, the company decided it was relocating to Garden Grove, California. Since Mr. Puzzullo had no interest in moving, when he was contacted by multiple company customers for employment opportunities, he decided to accept a position at DVY Construction Company of San Marco. Mr. Puzzullo stayed at this company for about 15 years. Around this same time, Mr. Puzzullo married his first wife. Their marriage did not produce children, but they remained married for approximately 10 years.

19

By 1995, the founder of DVY Construction opted to close the business, and Mr. Puzzullo decided to form a new company utilizing the same staff, workers, and equipment. This company prospered until 2011, when the peak of the recession forced him to cease operations. Around the time Mr. Puzzullo started his new company, in June 1998, he married his second wife, Kari Puzzullo. They were married for about 27 years. Unfortunately, Mrs. Puzzullo could not handle the immense stress resulting from the instant criminal case, and initiated divorce proceedings which were finalized in October 2025. Despite the divorce, Mr. Puzzullo remains very close to his ex-wife and Mrs. Puzzullo's daughter from a previous marriage, Kori, 38, as well as her three grandchildren.

When the recession stuck and forced Mr. Puzzullo to shut his business, he pivoted to his consulting company, Puzzullo, Inc., providing services to engineers, contractors, subcontractors, municipalities, and public utility districts on ongoing construction operations. Since then, he has been focused on building his consulting business by treating his employees as family. Whether that means purchasing lunch every day for office staff or insisting that the team dines together around the conference table. Mr. Puzzullo is constantly mentoring those around him because he wants others to succeed. Since Mr. Puzzullo was a young boy, if there was a problem, he would want to help and fix it in any way possible. That ideal has remained consistent in his life no matter what hardship he faced whether it was business or personal. Mr. Puzzullo truly embodies the meaning of a kind and gentle soul.

### 2. Mr. Puzzullo's Extraordinary Character and Reputation

To say that Mr. Puzzullo is caring, generous, and genuine is an understatement. Mr. Puzzullo has dedicated his entire life to helping others and always seeing the best in people, to a fault. From a young age, Mr. Puzzullo's older sister, Judy, recalled how he would help an elderly

neighbor by mowing her lawn, shoveling snow, and assisting a neighborhood boy deliver newspapers.  *See* **Ex. F**, at 6.  He did all of this for free without hesitation.  *Id*.  She further described him as "**always ready to help wherever he is needed… he is a special source of strength for our family always.**"  *See* Undated Letter from Judith Gersbacher, attached as **Exhibit G**.  Mr. Puzzullo's younger sister, Anne Marie, shared similar sentiments about her brother.  Since their parents passed away, she explained that:

> **"Jeff has stepped up to be the 'man' of the family.  Even from the other side of the country his love and support has always been there for us."**

*See* Undated Letter from Anne Marie Bond, attached as **Exhibit H**.

There is no one who knows Mr. Puzzullo better than his wife of nearly 30 years.  Kari Puzzullo expressed that Mr. Puzzullo has not changed in 28 years.  *See* October 30, 2025 Letter from Kari Puzzullo, attached as **Exhibit I**, at 1.  When they first met, Kari realized that Mr. Puzzullo treated everyone the same.  *Id*.  It did not matter who the person was, a neighbor, employee, server, someone he met on the street the same day – whatever Mr. Puzzullo can do to help someone he will do so without question.  *Id*.  More specifically, Kari shared that Mr. Puzzullo would try to help anyone who would come to their door.  *Id*, at 2.  When a neighbor had a problem with the Homeowner's Association, Mr. Puzzullo spent days researching and writing letters on his behalf to show his support.  *Id*.  On another occasion, when two other neighbors had friends who lost their homes in the California wildfires, Mr. Puzzullo immediately sent money even though he did not know these people personally.  *Id*.

One of Mr. Puzzullo's favorite causes is to help feed people in need.  *Id*.  He routinely sponsors less fortunate families during Christmas.  *Id*.  One year in particular, the church assigned a family with a teenage boy who wanted a PlayStation.  *Id*.  Mr. Puzzullo did everything in his

power to make sure that this boy received a PlayStation even though at the time the supply was low and finding a store which had the item in stock was difficult. *Id*. More recently, in October 2025, Mr. Puzzullo heard about his neighbor's son who was fixing fences in the neighborhood to save money for a car. *Id*. Once Mr. Puzzullo became aware of this, his immediate response was to buy the neighbor's son a car. *Id*. Without Mrs. Puzzullo advising him that it was inappropriate, he likely would have proceeded with the purchase.

Mr. Puzzullo has a positive impact on everyone he comes into contact with because his kindness is sincere and honest. Kori Harman, Mr. Puzzullo's stepdaughter views her stepfather as the "…**kindest, most generous soul**" she has ever met. *See* November 11, 2025 Letter from Kori Harman, attached as **Exhibit J**, at 1. During her childhood, Mr. Puzzullo was at every significant event and milestone in her life. *Id*. In fact, when Mr. Puzzullo's mother passed away, he took that small inheritance and put it into her college fund. *Id*. Mr. Puzzullo is always thinking of everyone else before himself. *Id*. Ms. Harman's husband, Ronald Gordon Harman, observed Mr. Puzzullo's profound role as a father figure to Kori and is amazed by his constant support for their family. *See* November 10, 2025 Letter from Ronald Gordon Harman, attached as **Exhibit K**, at 1. When his parents refused to support his marriage to Kori, it was Mr. Puzzullo who stepped up in their place. *Id*.

Mr. Puzzullo has affected those around him, not only because of his financial generosity but more importantly, due to his emotional support and selflessness. He has consistently offered tangible assistance to his stepdaughter's family, driving her to medical appointments, coordinating grocery deliveries during periods when her husband was at work, and purchasing food for their daughter who is afflicted with Celiac disease. *Id*, at 2.

He has even positively impacted his primary care physician, Dr. John Clancy. Dr. Clancy described Mr. Puzzullo as reliable and respectful, a "model patient." *See* October 27, 2025 Letter from Dr. John Clancy, attached as **Exhibit L**.

Mr. Puzzullo himself wrote a letter to Your Honor expressing his sincere remorse. He acknowledges that his actions have contributed to the losses of others and sincerely regrets his actions. *See* **Ex. A**, at 1. Mr. Puzzullo now understands that he should have known better and questioned those who were directing him. *Id*. Mr. Puzzullo explains that his character is based on what his parents instilled in him at a young age, and he would never do anything to deliberately harm another person. *Id*.

There are many more letters of support which we encourage the Court to read through, additional stories of Mr. Puzzullo's generosity and selflessness. These letters showcase the true character of a man whose sole focus is to be a positive impact on those around him, responsible, reliable, loving, and generous. The remainder of these letters are attached collectively as **Exhibit M**.

### IV.    Mr. Puzzullo's Immediate Cooperation with the Government

From the moment Mr. Puzzullo was served with a subpoena and subjected to a search of his home in Southern California pursuant to a warrant, he made every effort to assist the Government in any way possible. The Government approached Mr. Puzzullo early on to proffer and cooperate, and Mr. Puzzullo agreed promptly. *See* Addendum to the Presentence Report, at 39. For the multiple proffer sessions, Mr. Puzzullo flew from Southern California to New York City on his own dime and without hesitation. During the proffers, which were prior to his arrest and the arrest of the Millers, Mr. Puzzullo admitted falsifying the documents at the direction of the Millers. *Id*. The Government explained to Probation that Mr. Puzzullo's cooperation was "integral

to securing the convictions of the Millers." *Id*.  (internal quotation marks omitted).  He was prepared to testify at trial if necessary and readily admitted his wrongdoing accepting his responsibility in the scheme.  *Id*.  There is no question that Mr. Puzzullo's assistance was substantial. *Id*, at 40.

As emphasized in the PSR, Mr. Puzzullo's role in the instant offense, his lack of criminal history, his age, and mental health history and recent diagnosis, as well as his substantial assistance to authorities all warrant a non-guidelines sentence and a significant variance below the advisory guidelines.  Moreover, Probation explains that a term of imprisonment would be greater than necessary to comply with the factors to be considered in imposing a sentence and the defense agrees.  *Id*.  Accordingly, consistent with Probation's recommendations, we respectfully request a sentence of time served on all counts.  *Id*.

## V.    CONCLUSION

For the reasons set forth herein, Mr. Puzzullo respectfully requests that this Court sentence him to time served or, in the alternative, probation, as that would provide sufficient punishment, consistent with the sentencing factors enumerated in 18 U.S.C. § 3553(A) commensurate with his role and conduct.  A non-incarceratory sentence would be sufficient, but not greater than necessary, to achieve the statutory aims imposed by the sentencing guidelines while upholding respect for the law.  It is just punishment for the offense based on all the facts, circumstances and considerations relevant and material to this case.

DATED:        January 7, 2026
              New York, New York


                                        RESPECTFULLY SUBMITTED,

                                        GOTTLIEB TOWNSEND
                                        By: Robert C. Gottlieb, Esq.

                                        /s/ Robert Gottlieb_____
                                        Robert C. Gottlieb, Esq.
                                        Kaylee S. Kreitenberg, Esq.

cc: All Counsel of Record (via ECF)