


**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 15, 2026

<u>VIA ECF</u>

The Honorable Andrew L. Carter
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

  Re: *United States v. Jeffrey Puzzullo*, 25 Cr. 188 (ALC)

Dear Judge Carter:

  In advance of the January 22, 2026 sentencing in this case, the Government respectfully submits this letter, pursuant to Section 5K1.1 of the United States Sentencing Guidelines, to advise the Court that Jeffrey Puzzullo has provided substantial assistance to the Government in the investigation and prosecution of others. Accordingly, assuming he continues to comply with the terms of his cooperation agreement, the Government intends to move at sentencing, pursuant to Section 5K1.1, for the Court to sentence him in light of the factors set forth in Section 5K1.1.

**I. Background**

  Jeff Puzzullo was a longtime construction consultant to Randy Miller and Chad Miller, President and CEO, respectively, of Legacy Sports USA LLC ("Legacy Sports"), which operated Legacy Park, a massive sports and entertainment complex in Mesa, Arizona. From in or about November 2019 through at least in or about July 2021, the Millers, Puzzullo, and others lied to bond investors about the volume and level of interest that youth sports organizations had in using Legacy Park. (PSR ¶ 9). The Millers, Puzzullo, and others fabricated and forged letters of intent and so-called "pre-contracts" that bore the names of persons and organizations that did not approve them, including youth sports programs and other sports-related organizations. (PSR ¶ 10).

  These forged documents claimed that major sports organizations had made binding commitments to use Legacy Park for a fabricated number of tournaments, with fabricated numbers of participants and expected spectators. Some of these forgeries were created from whole cloth by the defendants and their co-conspirators. Others used as their starting point real letters the defendants had obtained from sports organizations that expressed soft interest in or support for the Park, which the Millers fabricated into "binding" commitments to relocate to Legacy Park and inflated the importance of the commitment by adding fictious events, tournaments, or participants to the details, if any, that the organization had actually provided in the original letter. The Millers then used these forged documents to generate falsely inflated projected revenues for Legacy Park,

which were presented as projections to prospective bond purchasers based not on mere speculation or market research, but on the supposed binding commitments of over 50 sports organizations.

The defendants conveyed these forged documents and fraudulent projections to prospective investors to obtain approximately $284 million in municipal bond financing. (PSR ¶ 11). Specifically, to build Legacy Park, the Millers sold investors revenue-backed municipal bonds issued by the Arizona Industrial Development Authority, acting as a conduit for the entities that controlled Legacy Park—*i.e.*, bondholders would be paid only from the revenue generated by the Park. In the initial bond offering memorandum (the "Initial Offering Memorandum"), investor presentations, and materials made available to potential investors in a data room (the "Data Room"), the Millers claimed that Legacy Park expected to generate approximately $96.3 million in revenue after its first full year of operations in 2022. (PSR ¶¶ 22-23, 27-28, 29). That projection was based substantially on these false letters of intent and pre-contracts, which the Millers used to model that Legacy Park would be 100% occupied from opening and be able to meet the debt service commitment of the Legacy bonds. (PSR ¶¶ 23, 27).

In August 2020, the initial bond offering closed and generated approximately $251 million in bond proceeds. (PSR ¶ 36). In June 2021, Legacy Park raised another approximately $33 million in a supplemental bond offering that continued to incorporate these misrepresentations from the initial bond offering. (*Id.*).

Legacy Park opened in or about January 2022 and immediately began underperforming the Millers' revenue projections. (PSR ¶ 67). The park generated only approximately $14.7 million in revenue in its first six months of operation, as compared to $96.3 million that the Millers had projected Legacy Park would make in 2022. (*Id.*). In particular, Legacy Park was 43% off its budget in the first quarter of 2022 and 59% off budget in second quarter of 2022. (*Id.*). Legacy Park failed to make a single payment on its bonds. The first bond payment came due in August 2022, Legacy Park defaulted in October 2022, and then declared bankruptcy in May 2023. (PSR ¶¶ 69-72). Bondholders recovered no more than approximately $2.5 million in total—less than 1% of their investment.

The defendants' forgery scheme dates back to well before the Ziegler-led municipal bond financing effort commenced. Randy Miller began soliciting interest in building what ultimately became Legacy Sports Park almost 20 years prior. Puzzullo worked Miller dating back to those early 2000s years trying to build Legacy Park. Chad Miller, a former professional baseball player, initially began working for Randy Miller on the Legacy Park project on a part-time basis in the mid-2010s. (PSR ¶ 13). In 2011, Puzzullo loaned Randy Miller approximately $250,000 to keep the project going. There were at least three iterations of the project at different sites in Arizona over the years, and, at various times, Randy Miller worked with different financial backers and construction companies to try to generate sufficient investment to facilitate the building of the sports park. (PSR ¶ 13).

As part of that plan, Legacy Sports hired Sports Facilities Advisors ("SFA") in 2016 to perform a third-party feasibility study on the proposed project, which the Millers intended to use to solicit investors in the project. (PSR ¶ 14). Both Randy and Chad Miller met with members of the SFA team as SFA conducted its feasibility study. (PSR ¶ 15). SFA ultimately refused to

validate Legacy's extremely aggressive assumptions about the financials of the project. (PSR ¶¶ 15-16). Instead, SFA issued a pro forma using the assumptions that Randy Miller directed, but caveated that report with several stark warnings: the assumptions were directed to be included by Randy Miller and his team; SFA had not validated that data; and SFA did not anticipate Legacy Park would perform as Randy Miller hoped. (PSR ¶¶ 16-17).

By at least January 2018, the Millers started using the numbers SFA generated to solicit investors, but specifically excluded the express caveats SFA had included. Instead, they directed Puzzullo to alter the date of the study to make it look nearly a year more recent. (PSR ¶ 18). And the Millers directed Puzzullo to prepare a Legacy cover letter for their business plans that stated, contrary to SFA's actual conclusions, that SFA had "concluded that [all] the information provided meets their requirements for acceptance and validation into the development of this pro forma." (PSR ¶ 18). These business plans included letters of intent that even by as late as April 2019, six months before the Millers were introduced to Ziegler, were forged and altered to inflate anticipated attendance and revenues.

In December 2019, Puzzullo, using his company, Sports Elite Project Management, "co-wrote" a presentation with Legacy Sports, dated December 13, 2019, regarding the economic and fiscal impact of Legacy Sports Park on Mesa, Arizona. That report stated that Legacy Park was "estimated to attract over 3.15 million patrons annually, based upon current existing business sports/event/entertainment entity commitments for relocating their operations to the Sports Park. Legacy Sports USA has already procured commitments close to 100% occupancy at this time prior to the commencement of construction on the Park. These numbers are substantiated and validated by letters of intent and executed agreements with its partners." (PSR ¶ 19).

In November 2019, when Zeigler agreed to assist the Legacy team in financing the project through municipal bonds, Chad Miller and his co-conspirators turbocharged their fraud. As outlined in the tables in paragraphs 52 and 53 of the PSR, the defendant and his co-conspirators forged or misleadingly altered letters of intent or pro-forma contracts for 35 of the 54 organizations who were purportedly committed to the Legacy Park project, accounting for nearly 30% of the anticipated $96 million in year one revenue investors were told Legacy Park expected to generate. (PSR ¶¶ 52-54).

The forgeries spanned all types of documents used to get the bond offering over the finish line. It started with the letters of intent that the Legacy team had been soliciting as early as the SFA days in 2016. When Zielger suggested Legacy ask their customers to sign so-called "pre-contracts" that would show a firmer intent to use the Park when it opened, the Millers forged the vast majority of those pre-contracts. For example, Chad Miller directed Puzzullo to alter a prior letter from the Arizona Youth Soccer Association to make the letter appear to be a pre-contract, with language stating that the agreement "establishes a contract," wherein AYSA agreed to reserve 48 fields with 300-350 teams per tournament, for 28 tournaments, for a ten-year period. (PSR ¶¶ 30 35). Chad Miller similarly directed Puzzullo to forge the signature of the CEO of Special Olympics Arizona on a pre-contract that included vastly overstated participant attendance and headcount numbers for events held by the organization. (PSR ¶ 35). When the financing legal team asked for customers to sign assignments that would move their commitments from Legacy Sports to Legacy Cares, the

non-profit that formally owned the Park, the Millers and Puzzullo forged those too. (PSR ¶¶ 46-49).

Chad Miller repeatedly directed others, including Puzzullo, to copy signatures from the letters of intent to the forged assignment letters. As one example, on June 3, 2020, Chad Miller emailed Puzzullo working on the Legacy Park project, "here are a few more Consent to Assign forms that need your 'special touch.' lol. All of these forms have original signatures from their LOI's, its just very hard to decipher on these forms." (PSR ¶ 46(c)). The following day Chad Miller texted Puzzullo that he had uploaded all of the consent to assign forms and stated that they all needed to check the spelling, dates, and fonts, instructing, "Don't want to get in trouble just because we didn't do a quality control review lol." (PSR ¶ 47).

These forgeries supported the bond offering in multiple ways. First, the forged documents—the letters of intent and pre-contracts—were themselves made available to potential investors through the electronic Data Room that Ziegler provided. (PSR ¶ 29). Second, the Millers used the inflated attendance and revenue projections they fabricated in those documents to generate revenue projections in a spreadsheet called the pro forma, which was also made available to investors and incorporated into various investor documents like the Initial Offering Memorandum. (PSR ¶¶ 29, 44). Chad Miller, De Laveaga, and Puzzullo worked on the pro forma that modeled the data, which was made available to investors. (PSR ¶¶ 35, 41, 51).

Third, the Millers touted the false commitments to Legacy Park and the supporting revenue projections in both the Offering Memorandum and in the investor presentation that Chad Miller, Ziegler, and others held prior to the bond offering closing. (PSR ¶¶ 27, 50-51, 56). For example, on July 8, 2020, Chad Miller gave a webinar presentation to potential bond investors, wherein he presented a slide deck that touted the commitments from over 50 organizations that had signed letters of intent and pre-contracts that would ensure Legacy Park would be "at or near 100% occupancy on day one of opening." (PSR ¶ 27). Miller also claimed that the sports leagues' commitments supported the projected revenue, which he claimed would be sufficient to make the required bond payments. (PSR ¶ 27). Miller explained to investors that Legacy Park expected to generate $23 million in direct revenue from its first year of operations, based on 25 organizations that had purportedly signed pre-contracts, and approximately $18.9 million from 26 organizations that had signed letters of intent. (PSR ¶ 27).

And fourth, the defendants used the fabricated letters to support the purported validation of the project, both through the altered and misleadingly presented SFA analysis, and through the "peer review" of the SFA study by Johnson Consulting. (PSR ¶ 48). In May 2020, when Chad Miller, Puzzullo, and another Legacy consultant were working on the pro forma spreadsheet, Miller commented that "We still need to incorporate the original feasibility study somehow. Whether that be through labeling, or whatever, but we need to make sure that we include some of the feasibility study somehow." Puzzullo responded, puzzled, "Regarding SFA, we need to look at the old and new pro forma side by side to determine what you are trying to salvage from SFA because their data is now obsolete." Miller responded that he would call Puzzullo. After that, the language in the portion of the Initial Offering Memorandum that the Legacy team, not Ziegler, directly prepared, began including the language that "SFA has reviewed and analyzed the revised business model, utilizing its proprietary data base, and affirmed its prior findings regarding

feasibility and the increased revenue to be generated as a result of the additions" and that SFA had conducted an "independent analysis" and "feasibility study" in support of the project.

Chad Miller and his father made millions directly off the fraud. When the bond proceeds hit the Legacy Sports operating account that Randy Miller controlled, Randy Miller used the funds to pay himself and his family members extravagant salaries, purchase luxury vehicles for their personal use like a $135,000 Cadillac Escalade for Chad Miller, pay off other debts, and fund their next ventures.

Puzzullo also profited from the scheme, although nowhere near as handsomely as the Millers. For his 20 years of contracting service to the Millers (including significant legitimate construction consulting), Puzzullo had been promised $3 million payment by the Millers. In total, Puzzullo received approximately $575,000 from the Millers, not counting the $250,000 Puzzullo loaned to Randy Miller in the early 2000s that was never repaid. (PSR ¶ 74). Puzzullo was ultimately terminated in June 2022 when the Millers told him they could not pay him anymore.

Puzzullo's treatment by the Millers consistent with the broader dynamics of the conspiracy. The Millers directed and orchestrated the scheme; Puzzullo was told to execute it, occupying a significantly lesser role in the hierarchy. While Puzzullo did so knowing that what they were doing was wrong, the dynamics of the conspiracy, as well as his personal characteristics, discussed at length in Puzzullo's sentencing letter, demonstrate that Puzzullo occupied a significantly less culpable role than the Millers. For example, Puzzullo never spoke with investors directly, nor with customers directly. He took his orders from the Millers on how to modify the forged documents and provided them back to the Millers for their use. And, as discussed at length in Puzzullo's sentencing submission, the Government does not dispute that, while Puzzullo knowingly engaged in criminal conduct, he did so at the behest of Randy Miller, who frequently took advantage of Puzzullo over the course of their personal and professional relationship. In short, given Puzzullo's personal characteristics and the nature of this conspiracy, he occupied a significantly less culpable role in the conspiracy than others.

## II. Procedural History and Related Cases

On August 28, 2024, the FBI executed a search warrant at Puzzullo's home. During the execution of the search warrant, Puzzullo voluntarily spoke with FBI agents about Legacy and his role in it. When shown documents he altered, Puzzullo admitted that Chad Miller wanted the documents to look "good" and that Puzzullo fixed them, including updating the dates and copying signatures from one document to another. While Puzzullo downplayed his knowledge during the interview, telling the agents that while he knew this looked bad, he was relying on Chad Miller and Jeff De Laveaga, the COO, for direction, and asked if what he had done was a crime.

After that initial approach, Puzzullo retained counsel and began proffering with the Government. At all times, Puzzullo was honest about what he did in connection with altering and forging documents, and he provided detailed information about the directions he received from the Millers and other at Legacy. During his initial proffer, Puzzullo again downplayed his knowledge about whether these alterations were right and wrong, again stating that he was relying on the Millers and others for direction. By his second proffer, however, Puzzullo admitted, in connection with the alterations to the SFA Study, that he knew it was not right to alter the dates of a study to

make it look newer and disclosed that he had confronted Randy Miller about that alteration at the time. In total, Puzullo proffered four times with the Government and presented truthful and credible information about his conduct and the conduct of others.

Based in part on Puzzullo's assistance, described in more detail below, on March 31, 2025, the Government obtained Indictment 25 Cr. 138 (LAK), charging Randy Miller and Chad Miller with offenses related to the fraud scheme described above. On April 1, 2025, the Millers were arrested in the District of Arizona.

On April 24, 2025, Puzzullo self-surrendered, waived indictment, and pled guilty, pursuant to a cooperation plea agreement, to all four counts of Information 25 Cr. 188 (ALC), which charged Puzzullo with: (a) one count of conspiracy to commit securities fraud and wire fraud in connection with the Legacy Sports bond offering, in violation of 18 U.S.C. § 371 (Count One); (b) securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. §§ 240.10b-5, and 18 U.S.C. § 2 (Count Two); (c) one count wire fraud, in violation of 18 U.S.C. §§ 1343 & 2 (Count Three); and (d) one count aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b), and 18 U.S.C. § 2 (Count Four).  (PSR ¶ 1).

On May 28, 2025, the Millers each pleaded guilty to one count of Title 15 securities fraud and one count of aggravated identity theft. On September 9, 2025, Honorable Lewis A. Kaplan, United States District Judge for the Southern District of New York, sentenced Randy Miller to 72 months' imprisonment, 3 years' supervised release, and $7,289,134.89 in forfeiture. (PSR ¶ 4). That same day, Judge Kaplan sentenced Chad Miller to 60 months' imprisonment, 3 years' supervised release, and $4,798,890.19 in forfeiture. (PSR ¶ 5).

On April 1, 2025, Jeffrey De Laveaga, the COO of Legacy Sports, pleaded guilty, pursuant to a cooperation plea agreement, to all four counts of Information 25 Cr. 127 (RA), which charged De Laveaga with the same counts Puzzullo pleaded guilty to. Sentencing for De Laveaga has not yet been scheduled. (PSR ¶ 6).

### III. Guidelines

The Government agrees with the Guidelines calculation set forth in the PSR.  The PSR calculated a total offense level of 32.  (PSR ¶ 104). The PSR calculated zero criminal history points, for a criminal history category of I.  (PSR ¶ 108).  The PSR calculated a Guidelines range of 121 to 151 months' imprisonment.  (PSR ¶ 155).  Probation recommends a sentence of time served.  (PSR at 38).

The defendant's sole objection to the PSR is that Probation did not include a mitigating role adjustment for minor participant pursuant to U.S.S.G. § 3B1.2. Given the nature and duration of the defendant's conduct, the Government does not believe a mitigating role adjustment is warranted.

## IV. Assistance and Section 5K1.1

Puzzullo provided substantial assistance in the investigation and prosecution of others who have committed offenses, namely, Randy Miller and Chad Miller, qualifying under Section 5K1.1 of the Guidelines.

Puzzullo's assistance was "significan[t] and useful[]." U.S.S.G. § 5K1.1(a)(1). Most notably, his information was integral to the Government's ability to charge Randy Miller and Chad Miller. Specifically, Puzzullo proffered that, as far back as the SFA study, Randy Miller directed him to alter documents in ways that fraudulently strengthened the pitch for building the Legacy Sports project. That forgery scheme continued with both Millers, who directed Puzzullo to alter many different kinds of documents in support of Legacy bond offering. Puzzullo confirmed his actions, confirmed the directions he received from the Millers and others, and spoke candidly about the limits of his knowledge as he did not deal directly with bond investors or clients of Legacy Sports. Puzzullo's proffer statements filled in the gaps of the cold paper record of emails and text messages, particularly with respect to Randy Miller, who did not use electronic communications as frequently as the other participants in the scheme.

Puzzullo's information buttressed the expected testimony of De Laveaga, another cooperating defendant. While De Laveaga also provided credible, corroborated testimony that he also forged documents to support the bond offering at the direction of the Millers, the Government expected the Millers to argue, as they did pre-charge through counsel, that De Laveaga was responsible for directing much of the forging and that he mislead the Millers as to having permission from the sports organizations, De Laveaga's clients, to use their signatures on the forged documents. Puzzullo's expected testimony showed that this forgery scheme predated De Laveaga's involvement with Legacy Sports, and that particular aspects of it were directed by Randy and Chad Miller without De Laveaga's knowledge or involvement.

Puzzullo's assistance permitted the Government not only to charge Randy Miller and Charge Miller, but also to secure speedy guilty pleas from both defendants. The Government strongly suspects that one reason why the defendants pled guilty relatively shortly after arrest is that they knew that Puzzullo was assisting the Government and thus was prepared to testify against them at trial, given that Puzzullo's cooperation was public by the time they pleaded guilty.

The information Puzzullo provided was "truthful[], complete[], and reliab[le]." U.S.S.G. § 5K1.1(a)(2). Although initially Puzzullo minimized his knowledge and intent to the FBI and this Office, he, from the beginning proffered a complete account account of his activities to both the FBI and this Office, and thereafter admitted to his guilty intent. Additionally, Puzzullo's information was corroborated by other evidence, including text messages, call records, emails, document metadata, and expected witness testimony from others.

The "nature and extent" of Puzzullo's assistance were impressive. U.S.S.G. § 5K1.1(a)(3). Puzzullo spent hours proffering with the Government on multiple occasions, flying from his home in California to New York to meet in person with the Government. He proffered detailed information about the misconduct of Randy Miller and Chad Miller, with whom he'd worked for nearly two decades and trusted deeply. He was prepared to testify against them if needed. He accepted responsibility for his actions, notwithstanding the minimal gain he received in this case

and the devastating personal consequences it had to his family, as explained at length in his sentencing submission. His decision to accept responsibility and testify against the Millers reflected a serious and concerted effort by Puzzullo to assist the Government's investigation, at significant personal expense.

Thankfully, Puzzullo did not "suffer[]" any "injury," and the Government is not aware of any "danger or risk of injury to [Puzzullo] or his family resulting from his assistance." U.S.S.G. § 5K1.1(a)(4). That said, Puzzullo lost his marriage as a result of the stress caused by the investigation and conviction (Def. Br. at 20). He will also face a criminal conviction and financial penalties as part of his conviction.

Finally, "the timeliness of [Puzzullo]'s assistance" was positive. U.S.S.G. § 5K1.1(a)(5). Very shortly after being contacted by the FBI, Puzzullo, through counsel, indicated that he was prepared to assist the Government, and thereafter Puzzullo immediately made himself available to be interviewed at the Government's request, flying from California to New York. As noted above, this assistance came before, and likely precipitated, the defendants' guilty pleas and was therefore quite timely.

## V. Conclusion

Puzzullo provided substantial assistance in the investigation and prosecution of the Millers. Assuming that he continues to comply with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move for the Court to sentence him pursuant to Section 5K1.1 of the Guidelines.

Respectfully submitted,

JAY CLAYTON
United States Attorney

by: _____/s/_____
Courtney L. Heavey
Matthew R. Shahabian
Assistant United States Attorneys
(212) 637-2413 / -1046

cc:   Robert Gottlieb, Esq. (by ECF)
      Kaylee S. Kreitenberg, Esq. (by ECF)